UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

NORMA REYES, JULIUS SEGAR, KURT GORIN, and
ALICK SEGAR

                                     Plaintiffs,

                -against-

THE CITY OF NEW YORK, LIEUTENANT RAYMOND
MEYER, POLICE OFFICER LAWRENCE SANCHEZ,
SHIELD NO. 26252, POLICE OFFICER JOSE TORRES,
JOHN DOE #1-3

                                  Defendants.

---------------------------------------------------------------------- x

**FIRST AMENDED
COMPLAINT AND
JURY DEMAND**

17-cv-05822-LAK

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which plaintiffs seek relief for the violation of their rights secured by 42 USC §1983 and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of New York.

2.    The claims arise from a May 15, 2016 incident, in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiffs to false arrest and excessive force.

3.    Plaintiffs seek monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4.    This action is brought pursuant to 28 U.S.C. §1331, 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution.

5.    Venue is laid within the United States District Court for the Southern District of New York in that Defendant City of New York is located within, and the events occurred within, the

boundaries of the Southern District of New York.

## PARTIES

6.     Plaintiffs, Norma Reyes, Julius Segar, Kurt Gorin and Alick Segar are residents of Bronx County in the State of New York.

7.     The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

8.     Police Officers Lawrence Sanchez, Shield No. 26252, Jose Torres, and Lieutenant Raymond Meyer were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agent, servant and employee of the City of New York.  On information and belief, defendants Sanchez, Torres and Meyer were personally involved in the illegal arrest of plaintiffs and/or the use of excessive force against plaintiffs and/or failed to intervene in the actions of their fellow officers.   Defendants Sanchez, Torres and Meyer are sued in their individual capacity.

9.     John Doe #1-3, individuals whose name are currently unknown to plaintiffs, are NYPD police officers and employees of the City of New York.  Upon information and belief, John Doe #1-3 were personally involved in the illegal arrest of plaintiffs and/or the use of excessive force against plaintiffs and/or failed to intervene in the actions of his/her fellow officers.  John Doe #1-

3 are sued in their individual capacities.

10.     At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

11.     On May 15, 2016, plaintiff Norma Reyes was approximately 10 weeks pregnant.

12.     Julius Segar was the father of Ms. Reyes' unborn child on May 15, 2016.

13.     Kurt Gorin is Julius Segars' cousin, and on May 15, 2016 he was 16 years old.

14.     Prior to May 15, 2016, each of the plaintiffs had had prior interactions with defendant Meyer.

15.     In April of 2016 plaintiff Norma Reyes filed a complaint against Lt. Meyer with the NYPD's Internal Affairs Bureau ("IAB").

16.     On May 15, 2016 at approximately 8:30 pm, plaintiffs Norma Reyes, Julius Segar, Kurt Gorin and Alick Segar were near the building located at 1314 Seneca Avenue in Bronx, New York.

17.     Mr. Gorin saw Lt. Meyer and another officer, who he later learned to be Officer Sanchez, approaching his general area.

18.     To avoid further harassment by Lt. Meyer, Mr. Gorin attempted to walk away from the area before the officers arrived.

19.     Lt. Meyer followed Mr. Gorin, overtook him, pushed him against a wall and detained him there.

20.     Mr. Gorin objected to his detention without cause.

21.     Lt. Meyer acted in an extremely aggressive manner toward Mr. Gorin, and after a few

moments withdrew a chemical spray canister and threatened to spray Mr. Gorin with it.

22.    Mr. Gorin was not acting in aggressive manner, and was not threatening or trying to get away from the officers.

23.    Ms. Reyes and Julius Segar began filming the interaction while Mr. Gorin was detained against the wall.  Alick Segar was present watching the interactions.

24.    Mr. Gorin covered his eyes to protect himself from Lt. Meyer's chemical spray.

25.    Lt. Meyer pushed Mr. Gorin to the ground.

26.    Officer Torres and John Doe #1-3 appeared shortly after Mr. Gorin was pushed to the ground.

27.    Officer Torres and John Doe #1-3 made Ms. Reyes and Julius Segar step back from the Mr. Gorin, and in so doing, blocked the line of sight from their cameras.

28.    While the other officers shielded him from the cameras, Lt. Meyer kneeled near Mr. Gorin, and used his chemical spray on Mr. Gorin's face.

29.    When Lt. Meyer used the chemical spray, Mr. Gorin was lying on his stomach on the ground and was not resisting or threatening the officers.

30.    After using his chemical spray on Mr. Gorin, Lt. Meyer stood up and approached the other plaintiffs, directing the other officers to "take them all", indicating Ms. Reyes, Julius Segar and Alick Segar should be arrested as well.

31.    Lt. Meyer approached Ms. Reyes Julius Segar and Alick Segar and began spraying his chemical spray in their direction.

32.    Ms. Reyes, Julius Segar, and Alick Segar were hit about their faces and bodies with the chemical spray.

33.    During the course of her arrest, the officers pushed Ms. Reyes against a wall.

34.    Mr. Gorin, Ms. Reyes, Julius Segar and Alick Segar were all arrested, and put into a police vehicle.

35.    In the police vehicle, Ms. Reyes noticed she was bleeding.  She alerted the transporting officers that she was pregnant, was bleeding between her legs, and needed immediate medical treatment.

36.    No immediate medical treatment was provided to Ms. Reyes.

37.    The plaintiffs were taken to the NYPD's 41st precinct and booked for arrest.

38.    Plaintiffs were initially given only a small and totally insufficient amount of water to clean the chemical spray from their faces and eyes.

39.    Plaintiffs requested to be allowed to clean their faces more thoroughly in a bathroom or other facility with running water, but were denied such access for an extended period of time before eventually being allowed to wash their faces in a bathroom in the precinct.

40.    An ambulance was eventually called for Ms. Reyes and she was transported to Lincoln Hospital.

41.    Ms. Reyes suffered a miscarriage.

42.    In the police precinct defendant police officers used excessive and unnecessary force against Alick Segar.

43.    Upon information and belief, defendants created police paperwork recording charges of disorderly conduct and resisting arrest as the basis for the arrests of plaintiffs.

44.    The plaintiffs were transported Bronx Central Booking to await arraignment.

45.    At approximately 10:00 PM on May 17, 2016 the Bronx County District Attorney's Office declined prosecution of each of the plaintiffs.

46.    The District Attorney's Office's reasons for declining to prosecute were a lack of

probable cause and inability to prove the charges beyond a reasonable doubt.

47.    Plaintiffs were released from custody shortly after the District Attorney's Office's declined to prosecute them.

48.    No charges were ever brought against plaintiffs related to this incident.

49.    Defendants lacked probable cause or reasonable suspicion to believe plaintiffs had been involved in any illegal activity.

50.    At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiffs' rights.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against plaintiffs.

51.    During all of the events above described, defendants acted maliciously and with intent to injure plaintiffs.

## DAMAGES

52.    As a direct and proximate result of the acts of defendants, plaintiffs suffered the following injuries and damages:

a.    Violation of their rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure;

b.    Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

c.    Loss of liberty;

d.    physical pain and suffering.

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983 – as to All Plaintiffs against the Individual Defendants)

53.    The above paragraphs are here incorporated by reference.

54.    Defendants have deprived plaintiffs of their civil, constitutional and statutory rights under color of law and have conspired to deprive them of such rights and are liable to plaintiffs under 42 USC § 1983.

55.    Defendants' conduct in arresting plaintiffs without probable cause to believe they had committed a crime deprived plaintiffs of their right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. Defendants' conduct also deprived plaintiffs of their right to due process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

56.    Defendants' conduct in discharging their chemical spray weapons onto plaintiffs' faces deprived plaintiffs of their right to be free of the use of excessive force.   Furthermore, defendants' failure to allow plaintiffs to adequately remove the chemical spray from their faces following the initial use of the weapons exposed plaintiffs to continued unnecessary and excessive force.

57.    Defendants falsely arrested plaintiffs, used excessive force against plaintiffs, and failed to intervene in each other's obviously illegal actions.

58.    Plaintiffs have been damaged as a result of defendants' wrongful acts.

**SECOND CAUSE OF ACTION**
(42 U.S.C. § 1983 – as to Norma Reyes against the Individual Defendants)

59.    The above paragraphs are here incorporated by reference.

60.    Defendants have acted under color of law to deprive plaintiff Norma Reyes of her civil, constitutional and statutory rights to due process of law pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and are liable to plaintiff under 42 USC §1983.

61.    Defendants knew plaintiff suffered from a serious medical condition when she

explained that she was pregnant, was bleeding, and needed immediate medical attention.

62.   Defendants were deliberately indifferent when they repeatedly disregarded that condition by failing to provide or allow Ms. Reyes to obtain immediate medical treatment.

63.   Defendants' deliberate indifference to plaintiff's medical condition caused plaintiff to sustain a miscarriage.

64.   Defendants' deliberate indifference prevented plaintiff from receiving immediate gynecological treatment, which upon information and belief may have been able to prevent her miscarriage.

65.   Plaintiff was damaged by the deliberate indifference of the defendants.

## THIRD CAUSE OF ACTION
(42 U.S.C. § 1983 – Municipal Liability)

66. The above paragraphs are here incorporated by reference.

67. The City is liable for the damages suffered by Plaintiffs because, after learning of its employees' repeated violations of New Yorkers' constitutional rights, the City has:  failed to remedy the wrong; created a policy or custom under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events.  The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct.  By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

68. On numerous occasions over the span of many years, the City of New York has been alerted to the frequency of false arrests charges brought by its police officers.  Despite having acquired such knowledge, the City has refused to appropriately sanction its employees'

illegal behavior.

69. The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct, has caused the constitutional violations against Plaintiff in this case.

**THE CITY FAILS TO TRACK LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE OF CIVIL RIGHTS ACTIONS**

70. The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize citizens without probable cause, bring charges against citizens with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

71. It is well documented that the number of claims against the NYPD has doubled in recent years and has cost taxpayers more than $1 billion.[1]  Despite these staggering figures, the City

---

[1] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

has repeatedly resisted attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD.  Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data.[2]

72. Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct.  *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

73. However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.  By failing to keep track of this crucial data – which could save lives as well as taxpayer money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

**THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY**

74. The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from

---

[2] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases.  A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

accountability.[3]  The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose.  "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*, 446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

75. Furthermore, civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[4]

76. For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability.  Nonetheless, the City has failed to take action to hold officers or precincts accountable, and has failed to investigate to what extent certain officers, units, and precincts are disproportionately responsible.

77. In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[5]  Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers,
> fails to take curative action, and not infrequently fosters a situation
> in which an officer will engage in another act of violation,
> resulting in harm to another person and further damages from the

---

[3] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

[4] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change," March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

[5] *Id.*

City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[6]

78. The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to" violate New Yorkers' civil rights.[7]

79. The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today.  The pattern is now all too familiar:  the City pays vast sums of money to resolve cases where New Yorkers' constitutional rights have been violated, while the NYPD does nothing to financially incentivize its officers to change their behavior, and fails to investigate or address the underlying causes of such violations.

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS – SUCH AS THE ONE PLAINTIFFS WERE SUBJECTED TO – THROUGH ITS USE OF ARREST QUOTAS**

80. The City has also been alerted to the regular use of stop, question, and frisk by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such police intrusion actually produce, and despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

81. Even as the use of stop, question, and frisk has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

---

[6] *Id.*

[7] *Id.*

82. According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times.  Of the people stopped:  38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[8]

83. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people.  For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[9]  The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[10]

84. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[11]

85. The City is aware that performance goals and quota imposed on officers leads to unconstitutional detentions, yet has not taken adequate or sufficient steps to end the use of such quotas.

86. The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority.  Such failures have led to further

---

[8] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[9] *See* NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

[10] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[11] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

abuse of authority by police officers, including the incident underlying Plaintiff's Complaint.

87. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.  As the Honorable Jack Weinstein, United States District Court Judge for the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department— there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

88. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This failure and these policies caused the officers in the present case to violate plaintiffs' civil rights, without fear of reprisal.

89. Plaintiff has been damaged as a result of the City's deliberate indifference.

WHEREFORE, plaintiffs demand judgments against the defendants, jointly and severally, as follows:

A.      In favor of plaintiffs in an amount to be determined by a jury for each of plaintiffs' causes of action;

B.      Awarding plaintiffs punitive damages in an amount to be determined by a jury;

C.      Awarding plaintiffs reasonable attorneys' fees, costs and disbursements of this

action; and

     D.     Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

     Plaintiffs demand a trial by jury.

DATED:     August 8, 2017
                Brooklyn, New York                        Respectfully yours,

                                                                   *Nicholas Mindicino*

                                                By: Nicholas Mindicino, Esq.
                                              Stoll, Glickman & Bellina, LLP
TO:     City of New York                                 Attorneys for Plaintiff
        Corporation Counsel Office                475 Atlantic Avenue, 3rd Floor
        100 Church Street                       Brooklyn, NY  11217
        New York, NY  10007                  (718) 852-3710
                                              (718) 852-3586
        Officer Lawrence Sanchez, Shield No. 26252     NMindicino@stollglickman.com

        Officer Jose Torres

        Lieutenant Raymond Meyer